IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAX ALOBWEDE ETAPE

     v.          :     Civil Action No. DKC 2005-1404

JANET NAPOLITANO[1]

          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this naturalization action are: (1) Defendant's motion for summary judgment (Paper 88); (2) Defendant's motion to seal (Paper 87); and (3) Plaintiff's motion to strike (Paper 98). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the following reasons, Defendant's motion for summary judgment and motion to seal will be granted, and Plaintiff's motion to strike will be denied. As a result, Plaintiff's petition for naturalization will be denied.

**I.  Background**

The following facts are undisputed. Plaintiff Max Alobwede Etape was born in the Republic of Cameroon and arrived in the United States on a student visa in 1980. He filed an application for naturalization with the Washington, D.C., District Office of

---

[1]  Plaintiff originally filed this action against Michael Chertoff, the former Secretary of the United States Department of Homeland Security. Janet Napolitano, Mr. Chertoff's successor, will be substituted as the proper Defendant pursuant to Federal Rule of Civil Procedure 25(d).

the Bureau of Citizenship and Immigration Service, United States Department of Homeland Security ("USCIS"), on April 2, 2003. Plaintiff appeared for his initial interview at the USCIS District Office in Baltimore, Maryland, on September 9, 2003. The application was continued in order for USCIS to obtain additional information, which Plaintiff subsequently submitted. On May 23, 2005, Plaintiff filed a complaint in this court, pursuant to 8 U.S.C. § 1447(b), contending that more than 120 days had elapsed since his examination and that USCIS had not yet rendered a decision on his naturalization application.[2]

While his complaint in this court was pending, USCIS denied Plaintiff's naturalization application on the ground that he lacked good moral character, as required to become a United States citizen under 8 U.S.C. § 1427(a). Defendant subsequently moved to dismiss the complaint, or alternatively, for summary judgment. (Paper 13).

---

[2] 8 U.S.C. § 1447(b) provides:

(b) Request for hearing before district court

If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

This court granted Defendant's motion to dismiss for lack of jurisdiction, reasoning that its ability to consider Plaintiff's § 1447(b) petition depended on Plaintiff's underlying naturalization application remaining undecided by the USCIS. (Paper 42). Because USCIS had denied Plaintiff's application, the court determined that Plaintiff's § 1447(b) petition was moot. Plaintiff appealed the decision, which was reversed by the United States Court of Appeals for the Fourth Circuit. *Etape v. Chertoff*, 497 F.3d 379 (4th Cir. 2007). The Fourth Circuit determined that § 1447(b) vests exclusive jurisdiction in the district court, thereby depriving USCIS of jurisdiction to adjudicate an application unless the district court instructs it to do so.

Following the Fourth Circuit's reversal, this court held a status conference to discuss how the case should proceed. (Paper 53). Plaintiff's counsel represented that he wanted to pursue a possible settlement with USCIS. USCIS responded that it would reconsider its denial of Plaintiff's naturalization application if, upon investigation of the legitimacy of certain foreign documents Plaintiff submitted in support of his naturalization petition, it determined they were genuine. The case was then referred to Magistrate Judge William Connelly to oversee the investigation of these documents.

In December 2007 and January 2008, Special Agent Miguel Eversley, a United States Department of State investigator based at

United States embassy in Cameroon, conducted an investigation into the documents Plaintiff had submitted in support of his petition. At the conclusion of his investigation, Agent Eversley determined that three of Plaintiff's documents were forgeries: (1) an adoption certificate dated February 27, 2006, and purportedly signed by Maitre Achuo Sylvanus; (2) an adoption decree ruling dated May 12, 1983, and purportedly signed by Judge Ndoke Cole; and (3) a letter purportedly written by Jean-Baptiste Hangheu, the Commissioner of Emi-Immigration in Buea, Cameroon.

### A.  Adoption Certificate

The adoption certificate states that Plaintiff was adopted on May 12, 1983, by Emmanuel Mekole Etape and Edna Ni Dungu.  (Paper 38, Ex. 1).  The certificate was purportedly issued by Judge Ndoke Cole and signed by Maitre Achuo Sylvanus, Registrar-in-Chief. Pursuant to his investigation, Agent Eversley spoke directly with Mr. Sylvanus and presented a copy of the adoption certificate purportedly containing his signature.  According to Agent Eversley, Mr. Sylvanus proceeded to "laugh in amazement," explaining that the signature was not his and that he was not the Chief Registrar for the court, as the document alleged.  Mr. Sylvanus then provided samples of his signature and the court's seal for purposes of comparison.  Agent Eversley compared these samples with the signature and seal on the adoption certificate submitted by

Plaintiff and concluded that Plaintiff's adoption certificate was a forgery.

## B.  Adoption Decree Ruling

The adoption decree ruling includes much of the same information as the adoption certificate, and was purportedly signed by Judge Ndoke Cole of the Manyu High Court.  To determine the validity of this document, Agent Eversley met with Isaac Tambi, Chief Registrar of the High Court, Manyu Division, in the city of Mamfe.  Mr. Tambi informed him that there had never been a judge named Ndoke Cole assigned to the Manyu High Court.  Based on this information, Agent Eversley determined that the adoption decree was also a forgery.

## C.  Letter from Jean-Baptiste Hangheu

In support of his naturalization petition, Plaintiff also submitted a letter purportedly written by Jean-Baptiste Hangheu, the Commissioner of Emi-Immigration of Buea.  (Paper 36, Ex. 3). The letter, dated March 6, 2006, appeared to have been written in response to Plaintiff's request, in July 1993, for a copy of an application Plaintiff submitted for a Cameroonian passport in June 1993.  When Agent Eversley met with Mr. Hangheu and showed him the letter, Mr. Hangheu stated that he had never worked in Buea, had never worked in the Office of Immigration, and that the signature on the letter was not his own.  Mr. Hangheu then provided three

samples of his actual signature for comparison.  (Paper 88, Ex. 14).

Agent Eversley subsequently traveled to the city of Buea and met with Henry Nkengasong, Chief of the Office of Immigration.  Mr. Nkengasong confirmed that Mr. Hangheu had never worked in that office.  Mr. Nkengasong then reviewed the letter, observed grammatical errors and the use of outdated letterhead, and stated that the letter had not been issued by his office.  For comparison, Mr. Nkengasong provided copies of the letterhead and government seal that were used by the Office of Immigration in Buea at the time the letter was purportedly written.  Based on all of this information, Agent Eversley determined that the letter had also been forged.  He then created a report of his investigation and submitted a declaration describing the above findings.  (Paper 88, Ex. 13).

Defendant filed a motion for summary judgment on January 12, 2009, arguing that Plaintiff lacked the good moral character required to become a United States citizen.  (Paper 88).[3]

---

[3] Contemporaneously with the filing of her motion for summary judgment, Defendant filed a motion to seal the administrative record pursuant to Local Rule 105.11.  There is a well-established common law right to inspect and copy judicial records and documents. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978).  If competing interests outweigh the public's right of access, however, the court may, in its discretion, seal those documents from the public's view.  *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).  Prior to sealing any documents, the court must provide notice of counsel's request to seal and an
(continued...)

Defendant attached to her motion numerous exhibits, including Agent Eversley's report, declaration, and copies of the sample seals and signatures that Agent Eversley obtained pursuant to his investigation in Cameroon.   On May 1, 2009, Plaintiff filed a motion to strike evidence supporting Defendant's motion for summary judgment (paper 98), as well as papers opposing Defendant's summary judgment motion (paper 99).   Appropriate replies have been filed and the matters are ready for resolution.[4]

## II.   Standard of Review

It is well-established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material

---

[3](...continued)
opportunity to object to the request before making its decision. *Id*. at 234. Additionally, the court should consider less-drastic alternatives, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives to sealing.   *Id*. at 234-35.

For the reasons stated by Defendant, both the Privacy Act, 5 U.S.C. § 552, and law enforcement concerns support the claim that the administrative record should be sealed.   Furthermore, alternatives to sealing the record, such as not submitting or redacting sensitive portions, would not suffice in this case. Defendant's motion was docketed on January 12, 2009, and no opposition has been filed. Accordingly, Defendant's motion to seal will be granted.

[4] This case is before the court, on remand from the Fourth Circuit, pursuant to 8 U.S.C. § 1447(b).   The Fourth Circuit directed the court to decide whether to remand the case to USCIS or to "determine the matter" itself.   Because USCIS has already denied the petition, albeit without jurisdiction, a remand would serve no useful purpose.   Accordingly, the court will consider the merits of Plaintiff's petition for naturalization in the context of Defendant's motion for summary judgment.

fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her

responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  Analysis

In a naturalization proceeding, "the burden is on the alien applicant to show his eligibility for citizenship in every respect," and any "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Director*, 385 U.S. 630, 637 (1967) (internal marks and citation omitted).  In addition to establishing certain residency requirements, which are not contested here, the petitioner must demonstrate that he is "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."  8 C.F.R. § 316.2(a)(7); 8 U.S.C. § 1427(d).

A petitioner must show "good moral character" for the five years immediately preceding the filing of his or her application, and from the date the application is filed up to the date he or she is admitted for citizenship. *United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007). The court may consider the applicant's conduct at any time prior to that period, however, if his or her conduct during the statutory period does not reflect that there has been reform of character from past misdeeds or if the earlier conduct is otherwise relevant in determining the applicant's present moral character. 8 C.F.R. § 316.10(a)(2). The court must "evaluate claims of good moral character on a case-by-case basis," considering certain statutory restrictions and "the standards of the average citizen in the community of residence." *Id*.

Pursuant to 8 U.S.C. § 1101(f), a person shall not "be regarded as, or found to be, a person of good moral character" if, within the relevant time period, his or her conduct falls into a number of enumerated categories. This subsection also contains a "catch-all" provision: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f).[5] By adding this provision, "Congress delegated

---

[5] Regulations adopted pursuant to this catch-all provision are entitled to deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an
(continued...)

authority to the former INS to set forth 'other reasons' affecting determinations of good moral character." *Jean-Baptiste*, 395 F.3d at 1194.   Pursuant to that authority, the Attorney General issued 8 C.F.R. § 316.10, which provides, in pertinent part, that "the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character," unless the applicant can establish extenuating circumstances. *Jean-Baptiste*, 395 F.3d at 1194 (quoting 8 C.F.R. § 316.10(b)(3)(iii)).   The phrase "unlawful acts" is not defined, but has been interpreted to mean "bad acts that would rise to the level of criminality, regardless of whether a criminal prosecution was actually initiated." *Meyersiek v. United States Citizenship & Immigration Servs*., 445 F.Supp.2d 202, 205 (D.R.I. 2006); *see also Dang*, 488 F.3d at 1141; *Jean-Baptiste*, 395 F.3d at 1193-94.

Here, Defendant argues that she is entitled to summary judgment because Plaintiff lacks the good moral character required to become a United States citizen, as evidenced by the following conduct by Plaintiff: (A) submission of false affidavits to USCIS

---

[5](...continued)
express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.   Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."); *see also United States v. Jean-Baptiste*, 395 F.3d 1190, 1193 (11th Cir. 2005) (giving deference to the "catch-all" provision of 8 U.S.C. § 1101(f)); *United States v. Lekarczyk*, 354 F.Supp.2d 883, 887-88 (W.D.Wis. 2005) (same).

and this court regarding his use of Social Security numbers; (B) Social Security fraud; (C) submission of forged documents to this court; (D) second-degree assault; (E) failure to report his entire criminal history on his N-400 form and during his naturalization interview; (F) adultery; (G) failure to pay child support; (H) failure to appear in Maryland state court to answer for a traffic citation; and (I) violation of probation.  It is not necessary for Defendant to show that all of this alleged misconduct occurred. Rather, if any conduct sufficient to show the lack of good moral character is established as a matter of law, Defendant's motion can be granted and Plaintiff's petition for naturalization denied.

### A.  Use of Social Security Numbers

On July 8, 1980, shortly after arriving in the United States, Plaintiff applied to the United States Social Security Administration ("SSA") to obtain a Social Security number ("SSN"). (Administrative Record ("A.R.") 794).  He was subsequently assigned the number 510-xx-xxxx.[6]  On September 28, 1993, Plaintiff applied to the SSA for a second SSN.  (A.R. 793).  Plaintiff contends that he applied for the second number after he renewed his Cameroonian passport and discovered that it listed an incorrect date of birth. According to Plaintiff, he was unable to correct the error on his passport and applied for a second SSN so the biographical

---

[6]  For privacy and security purposes, both parties have identified Plaintiff's social security numbers in this manner.

information on his passport and Social Security records would be consistent. (Paper 99, Ex. 1, Plaintiff Aff. at ¶¶ 5, 6).  It is undisputed, however, that when Plaintiff completed the application form to obtain a second SSN, he was asked whether he had ever previously received a SSN and answered in the negative.  (A.R. 793).  Plaintiff was subsequently issued a second SSN of 217-xx-xxxx.

Defendant argues that Plaintiff cannot establish good moral character because he submitted false affidavits to USCIS and this court regarding the use of his Social Security numbers. Specifically, Defendant contends that on September 7, 2005, Plaintiff signed an affidavit declaring under penalty of perjury that he "did not ever use [his] first [Social Security] number after obtaining the second [number]."  (Paper 88, Ex. 1). Approximately one year later, Plaintiff signed a second affidavit to the same effect, which he then submitted to this court. (Paper 21, Ex. 1 at ¶ 8).  According to Defendant, the falsity of both affidavits is evidenced by a July 1, 2000, student loan application in which Plaintiff indicated four different times that his SSN was 510-xx-xxxx, the first number he had been assigned.  (A.R. 1952-55).  Thus, according to Defendant, Plaintiff's affidavits falsely affirmed that he never used the first SSN after obtaining the second SSN because the evidence makes clear that he used the 510-xx-xxx number on his loan consolidation application after he was

13

assigned the second number.  Defendant argues that Plaintiff's acts
in this regard violated 18 U.S.C. § 1623, which criminalizes the
making of false material declarations before a grand jury or court,
and therefore were unlawful, barring a finding of Plaintiff's good
moral character under 8 C.F.R. § 316.10(b)(3)(iii).[7]

Plaintiff acknowledges that giving a false declaration under
oath constitutes a statutory bar to establishing good moral
character, but contends that only oral testimony and not written
misrepresentations, such as those at issue here, implicate such a
bar.  This argument relates to the wrong subsection of § 1101(f).
It is true, as Plaintiff argues, that under 8 U.S.C. § 1101(f)(6),
a person who gives false testimony in order to obtain an
immigration benefit is deemed to be lacking good moral character;
moreover, the Supreme Court of the United States has determined
that such "testimony" is limited to oral statements made under
oath.  *United States v. Kungys*, 485 U.S. 759, 780 (1988).  However,

---

[7]  18 U.S.C. § 1623(a) provides:

> (a) Whoever under oath (or in any declaration,
> certificate, verification, or statement under
> penalty of perjury as permitted under section
> 1746 of title 28, United States Code) in any
> proceeding before or ancillary to any court or
> grand jury of the United States knowingly
> makes any false material declaration or makes
> or uses any other information, including any
> book, paper, document, record, recording, or
> other material, knowing the same to contain
> any false material declaration, shall be fined
> under this title or imprisoned not more than
> five years, or both.

Defendant does not allege that Plaintiff lacks good moral character under § 1101(f)(6); rather, Defendant's argument is that Plaintiff's conduct violated 18 U.S.C. § 1623 and constitutes "unlawful acts" under 8 U.S.C. § 1101(f)(8) and 8 C.F.R. § 316(b)(3)(iii).  The Fourth Circuit has explicitly held that a person can be guilty under § 1623 for submitting false written representations to the court, including written declarations. *United States v. Johnson*, 325 F.3d 205, 209 (4th Cir. 2003).

Plaintiff further argues that even if his written statements constitute false declarations under 18 U.S.C. § 1623, Defendant cannot establish that he made them "knowingly," as required under the statute.  As support, Plaintiff submits an affidavit stating that he never "intentionally" used his first SSN after obtaining the second number, although he "had forgotten that [he] was forced to use it when consolidating a student loan that [he] had obtained prior to having [his] second social security number."  (Paper 99, Ex. 2, Plaintiff Aff. at ¶ 8).  According to Plaintiff, he could not use his second, valid SSN on the loan application because the loan company would not have been able to identify him based on his prior loans under the first SSN.  (*Id.*).  This oversight, Plaintiff asserts, was "entirely reasonable" in light of the fact that he submitted the loan application nearly five years prior to signing the affidavits at issue.

Defendant counters that Plaintiff's affidavit is self-serving and deserving of little weight, if any.  Defendant maintains that Plaintiff was responsible for verifying the accuracy of the statements he made in the prior affidavits before he signed them under penalty of perjury.  Indeed, a petitioner who swears under penalty of perjury has an "absolute" duty to ensure that "the answers be true and correct."  *See United States v. Sadig*, 271 Fed.Appx. 290, 295 (4th Cir. 2007); *see also* Fed.R.Evid. 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so").  Defendant argues that if the law were as Plaintiff posits, declarations would be meaningless because they could not be relied upon for their truth.  Particularly where the veracity of Plaintiff's prior affidavits is at issue, Plaintiff's submission of yet another affidavit attesting that he simply forgot that the affidavits he submitted previously were incorrect is suspect.  Nevertheless, on summary judgment, the court cannot weigh the evidence.  If the Plaintiff truly "forgot" that he had used the first social security number after he obtained the second, he would not have made the statements "knowingly."  Thus, Defendant has not shown, as a matter of law, that Plaintiff submitted false affidavits on the use of social security numbers.

**B.  Social Security Fraud**

As noted, Plaintiff obtained his first SSN shortly after arriving in the United States in 1980, and applied for a second SSN in 1993.  On his second application, Plaintiff represented that his date of birth was June 15, 1958.  (Paper 88, Ex. 5; A.R. 793).  In the affidavit he submitted to the court, however, Plaintiff identified his date of birth as February 21, 1960.  (Paper 88, Ex. 2 at ¶ 5).  In addition, when asked on the second application whether he had previously been assigned a Social Security number, Plaintiff checked the box labeled "No."  (Paper 88, Ex. 5; A.R. 793).  On his original application to obtain a SSN, Plaintiff listed his parents as "Regina" and "Andreas" (Paper 88, Ex. 18; A.R. 794), while his second application listed the names "Edna N. Dungu" and "Emmanuel Mekole Etape."  (Paper 88, Ex. 5; A.R. 793). Furthermore, Plaintiff signed the second application using the name "Etape Maxwell," and in no other document in the entire administrative record, spanning from 1980 to the present, has Plaintiff ever signed his name in this manner, including on his first application for a Social Security number.  Plaintiff also used a third SSN of 512-xxx-xxxx on at least two occasions in order to obtain subsequent student loans.  (Paper 88, Ex. 8; A.R. 1722-23).

Defendant argues that these actions constitute Social Security fraud in violation of 42 U.S.C. § 408(a)(7), as does the later use

17

of the second number.  Section 408(a)(7) provides that it shall be a crime for anyone, for any purpose, to "willfully, knowingly, and with intent to deceive, use a social security account number, assigned by the Commissioner of Social Security . . . on the basis of false information furnished to the Commissioner of Social Security by him or by any other person."  According to Defendant, Plaintiff's violations of § 408(a)(7) constitute "unlawful acts," and serve as an additional bar to a finding of good moral character under 8 C.F.R. § 316.10(b)(3)(iii).

Plaintiff provides several explanations for these numerous discrepancies, none of which is persuasive.  Plaintiff again argues that he obtained a second SSN so that his passport and Social Security card would reflect consistent biographical information; however, he never produced a copy of this erroneous passport listing his wrong date of birth, and he provides no explanation as to his use of a third SSN in order to obtain a student loan.  In addition, Plaintiff's claim that he was adopted in 1983, and hence included his adoptive parents' names on his second application, is belied by the record.  At the time of this alleged adoption, Plaintiff was 23-years-old, had been living in the United States as a permanent resident alien for over three years, and was married. (A.R. 311, 354).  According to Pauline Borderies, Vice-Consul at the United States Embassy, Cameroon, Cameroonian courts generally do not permit a married person to be adopted. (Paper 88, Ex. 17;

18

A.R. 402). Plaintiff additionally argues that he lacked the requisite intent to commit Social Security fraud because he did not "know his conduct was unlawful." (Paper 99, at 15). It is well-established, however, that ignorance of the law is generally no excuse. *Bryan v. United States*, 524 U.S. 184, 194-96 (1998).

Knowledge, willfulness and intent to deceive are required to establish liability under 42 U.S.C. § 408(a)(7), and may be proven by circumstantial evidence. *See United States v. Rastegar*, 472 F.3d 1032, 1037 (8th Cir. 2007) ("because intent is often difficult to prove directly, it may be proven by circumstantial evidence alone"); *United States v. Perez-Campos*, 329 F.3d 1214, 1217 (10th Cir. 2003) (affirming conviction under § 408(a)(7)(B) where defendant provided false SSN in order to conceal his identity); *United States v. McCormick*, 72 F.3d 1404, 1406-07 (9th Cir. 1995) (affirming defendant's conviction for fraudulent use of a SSN based on circumstantial evidence including defendant's failure to disclose in his application for a SSN that he had previously been assigned a SSN). The evidence presented here clearly demonstrates that Plaintiff affirmatively denied on his second SSN application that he had previously been assigned a SSN, and that he used a third SSN in order to obtain a student loan, a point that Plaintiff's opposition papers fail to address. This conduct is in violation of 42 U.S.C. § 408(a)(7), and thus constitutes "unlawful

acts" under 8 C.F.R. § 316.10(b)(3)(iii), barring a finding of good moral character.

### C.  Submission of Forged Documents

Defendant argues that Plaintiff also cannot establish good moral character because he submitted forged documents to the court in support of his naturalization application, in violation of 18 U.S.C. §§ 1503, 1519, and 1623.  Section 1503(a) provides that "whoever corruptly . . . endeavors to influence, intimidate, or impede . . . the due administration of justice, shall be punished as provided in subsection (b)."  Pursuant to § 1519, "whoever knowingly falsifies . . . any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States" is subject to a fine or imprisonment.  As noted previously, § 1623(a) makes it a crime to "knowingly make a false material declaration" under oath.

Plaintiff contends that Agent Eversley's declaration, report, and related documents regarding the alleged forgeries constitute inadmissible hearsay.  Accordingly, he has moved to strike: (1) Agent Eversley's declaration and report (Paper 88, Ex. 13); (2) the sample signatures and sample seal provided by Jean Baptiste-Hangheu (*Id.* at Ex. 14); and (3) the sample seal and letterhead used by the Commissioner of Emi-Immigration, Buea  (*Id.* at Exs. 15 and 16).  In

addition, Plaintiff seeks to exclude any reference to his submission of allegedly fraudulent documents. (Paper 98).

Plaintiff first argues that Agent Eversley's declaration, report, and documents related to his report do not comply with Fed.R.Civ.P. 56(e), which requires that declarations in support of or opposing a motion for summary judgment (1) are made on personal knowledge, (2) set forth such facts as would be admissible as evidence, and (3) show that the affiant is competent to testify to the matters therein. Specifically, Plaintiff contends that Agent Eversley did not have personal knowledge about the information to which he attested in his declaration and report because many of the individuals with whom he spoke relayed secondhand information to him. According to Plaintiff, this secondhand information constitutes inadmissible hearsay under Fed.R.Evid. 801(c).

Assuming that the Federal Rules of Evidence apply in this case, Defendant contends that Agent Eversley's report, declaration, and related documents are admissible under Fed.R.Evid. 803(8), which provides that public records and reports fall within an exception to the hearsay rule.[8] This subsection excepts:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities

---

[8] It is not necessary to resolve Defendant's argument that the Federal Rules of Evidence do not apply. The matter is not an easy one and, particularly given the paucity of naturalization cases decided by district courts *ab initio*, the case law is not developed.

of the office or agency, or (B) matters
observed pursuant to duty imposed by law as to
which matters there was a duty to report,
excluding, however, in criminal cases matters
observed by police officers and other law
enforcement personnel, or (C) in civil actions
and proceedings and against the Government in
criminal cases, factual findings resulting
from an investigation made pursuant to
authority granted by law, unless the sources
of information or other circumstances indicate
lack of trustworthiness.

Defendant insists that reports by State Department
investigators are admissible as "factual findings resulting from an
investigation made pursuant to authority by law" under Fed.R.Evid.
803(8)(C), relying on *Dolumbia v. Gonzales*, 472 F.3d 957 (7th Cir.
2007). In *Dolumbia*, a State Department investigator was charged
with determining whether several foreign documents submitted by the
petitioner had been forged. The agent conducted the investigation
and created a report of his findings, which was then submitted to
the court. The United States Court of Appeals for the Seventh
Circuit held that the investigator's report was admissible under
Fed.R.Evid. 803(8)(C), reasoning that "official reports like these
would be admissible despite their status as hearsay and regardless
of the availability of any opportunity to cross examine the
authors." *Dolumbia*, 472 F.3d at 963. As Defendant observes, other
courts have similarly held that it is permissible to consult
investigative reports by State Department officials to ascertain
the legitimacy of documents submitted to the court. *See Rexha v.
Gonzales*, 165 Fed.Appx. 413, 419-20 (6th Cir. 2006) (unpublished);

22

*see also Shlaku v. Gonzales*, 139 Fed.Appx. 700, 702 (6th Cir. 2005) (unpublished).

Plaintiff concedes that Defendant has set forth a set of factual findings that satisfy the minimum requirements of Fed.R.Evid. 803(8)(C). He contends, however, that Agent Eversley's factual findings are nonetheless inadmissible due to their "lack of trustworthiness." Plaintiff asserts that Defendant failed to present sworn affidavits from the individuals with whom Agent Eversley allegedly spoke as part of his investigation and, in some instances, failed to submit the documentation upon which the agent relied. Plaintiff argues that because Agent Eversley's investigation was conducted several years after certain documents were issued, the sample documentation is unreliable, and maintains that it is unfair to hold Cameroonian documents to the same rigorous standards applied in the United States.

Plaintiff's arguments are unpersuasive. Agent Eversley interviewed Mr. Hangheu, who allegedly wrote the letter from the Office of Immigration, and obtained Mr. Hangheu's signature, which looks nothing like the signature on the document Plaintiff submitted to this court. (*Compare* Paper 88, Ex. 14, Mr. Hangheu's actual signature, *with* Paper 88, Ex. 12, signature on document Plaintiff provided to USCIS and this court). Plaintiff insists that "it is reasonable to expect that a person's signature changes over time." (Paper 98, at 8). This implausible argument is

undermined by the fact that Mr. Hangheu viewed the letter and explicitly told Agent Eversley that he did not sign it. (Paper 88, Ex. 13, Eversley Report, at 2; A.R. 365).   In addition, Agent Eversley spoke directly with Mr. Sylvanus, whose signature was indicated on the adoption certificate.   Mr. Sylvanus explicitly told Eversley that he never signed the document. (*Id.*, Ex. 13, at 3; A.R. 366).   Furthermore, it is reasonable to believe that Mr. Tambi, the Chief Registrar of the Court, would know whether a person named Ndoke Cole had ever served as a judge on the Court.[9]

Agent Eversley's report satisfies all the requirements of Fed.R.Evid. 803(8)(C).   Agent Eversley is authorized by law to conduct investigations, he conducted the investigation pursuant to that authority, his report lays out the steps that he took as part of his investigation, and it contains findings of fact based on what he learned.   (Paper 88, Ex. 13, Eversley Decl., at 1). Therefore, to the extent that the Federal Rules of Evidence apply,

---

[9]   Plaintiff references an investigation conducted by the United States Department of Homeland Security, Immigration and Customs Enforcement, into the validity of the documents Plaintiff submitted to the court.   (A.R. 431).   The forensic document examiner explained that "[t]he diversity of forms, seal impressions, and authorizing signatures precludes the maintenance of a comprehensive set of reference specimens."   Even assuming that court seals and letterhead may change over time, however, the fact remains that both Mr. Hangheu and Mr. Sylvanus reviewed the documents in question and unequivocally informed Agent Eversley that the signatures on the documents were not their own.

Agent Eversley's report and accompanying declaration are admissible under Fed.R.Evid. 803(8)(C).[10]

In addition, Plaintiff argues that the use of Agent Eversley's declaration, report, and related documents as evidence violates his constitutional right to due process.  To succeed on a due process claim, Plaintiff must establish: (1) that a defect in the proceeding rendered it fundamentally unfair; and (2) that the defect prejudiced the outcome of the case.  *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008).  "These two elements are aimed at the same concern – the fairness of the proceeding."  *Id.*

 Plaintiff insists that Defendant's evidence is fundamentally unfair because it contains many instances of hearsay and is not trustworthy.   As previously explained, however, Defendant's evidence falls within the public records exception to the hearsay rule under Fed.R.Evid. 803(8)(C).  Additionally, as has already been determined, Agent Eversley's findings are trustworthy. Therefore, Plaintiff's motion to strike Defendant's evidence will be denied.

Plaintiff argues next that even if the evidence is admissible, he had no reason to believe that these documents were anything but genuine.   He maintains that Eyabe Elias Ebai, his lawyer in

---

[10] Defendant's alternative contention that the report and related documents are admissible under Fed.R.Evid. 803(8)(B) because they are part of the A-file administrative record fails. That exception applies to material collected for routine, mechanical purposes.

Cameroon, gathered all of the information in question and that Plaintiff was not involved in procuring the documents. Mr. Ebai has submitted an affidavit in support of Plaintiff's assertion, but this affidavit is illegible. (Paper 99, Ex. 5, Ebai Aff.). Nevertheless, Plaintiff's assertion in this regard is undermined by the fact that, in several filings submitted to this court, Plaintiff represented that he was the one who obtained the documents directly from the Cameroonian government. *See* Paper 19, Ex. 2, Plaintiff Aff. at ¶ 8 ("I am attempting to obtain [documents from Cameroon] . . . [but] I have not received anything responsive from the Cameroon government."); Paper 70, at 11 ("Mr. Etape gathered and provided Defendant with select documents, including his adoption documents from Cameroon . . ."; Paper 88, Ex. 11, Email from Plaintiff's Counsel ("Mr. Etape is working to obtain . . . documentation from Cameroon."). Thus, Plaintiff's contention that he was not personally involved in obtaining the documents is directly contradicted by his prior assertions to this court.

Plaintiff maintains that Defendant cannot show that he "knowingly" submitted forged documents to the court, as required under §§ 1519 and 1623. While these statutes do not define the term "knowingly," the Supreme Court has provided guidance as to the difference between "knowingly" and "willfully," as these terms are applied in criminal statutes. In *Bryan*, 524 U.S. at 190, the Court explained that for criminal statutes in general, a "willful" act is

one undertaken with a "bad purpose."  Thus, to establish
willfulness, the government must prove that the defendant acted
with knowledge that his conduct was unlawful.  The Court observed
that a "knowing" act is very different:

> Knowingly does not necessarily have any
> reference to a culpable state of mind or to
> knowledge of the law.  As Justice Jackson
> correctly observed, 'the knowledge requisite
> to [a] knowing violation of a statute is
> factual knowledge as distinguished from
> knowledge of the law.'. . . . Thus, unless the
> text of a statute dictates a different result,
> the term 'knowingly' merely requires proof of
> knowledge of the facts that constitute the
> offense.

*Bryan*, 524 U.S. at 192-93.

Under this definition of "knowingly," it is not necessary to
determine whether Plaintiff submitted the forged documents with the
knowledge that his conduct was unlawful.  Rather, the fact that
Plaintiff purposely (as opposed to inadvertently or accidentally)
submitted these documents is sufficient to establish that he acted
knowingly.  Therefore, Plaintiff's conduct is in violation of §
1519, and constitutes "unlawful acts" under 8 C.F.R. §
316.10(b)(3)(iii), barring a finding of good moral character.

Plaintiff's act of submitting forged documents to the court,
however, does not appear to trigger a violation under § 1623.
Section 1623 criminalizes false material representations made
"under penalty of perjury," such as declarations and affidavits.
Plaintiff submitted these documents in support of his

27

naturalization petition, and it is unclear whether they were filed under penalty of perjury.

Finally, with respect to liability under § 1503, Plaintiff argues that there is no evidence that he "intended" to impede or obstruct the administration of justice.   The issue of intent under § 1503, however, "may be inferred from the conduct of the defendant and the facts and circumstances surrounding the case which tend to show mental attitude and upon which reasonable inferences may be based." *United States v. White*, 557 F.2d 233, 236 (10th Cir. 1977). "The natural, probable consequences of an act may thus satisfactorily evidence the state of mind accompanying it, even when specific intent is a crucial element of the offense." *Id*.

Here, it is undisputed that Plaintiff purposely, as opposed to inadvertently, submitted the forged documents to the court. Plaintiff's action impeded the administration of justice because it required Agent Eversley to spend two months conducting an investigation in Cameroon into the legitimacy of these documents. Moreover, Plaintiff has seemingly engaged in acts of forgery in the past.  While he was in custody in New York on larceny charges in 1986, a search warrant was executed on his apartment.  The police discovered false Cameroonian seals, stamps for "Cameroon Bank" and "United Republic of Cameroon," and official letterhead from the Cameroon Bank and a Cameroonian secondary school.  (Paper 88, Ex. 21; A.R. 979-1002).  A grand jury indicted Plaintiff on one count

28

of Forgery in the Second Degree and two counts of Criminal Possession of a Forged Instrument. (A.R. 249-51, 1053). Plaintiff subsequently pleaded guilty to a superseding charge of Grand Larceny in the Third Degree.  As previously explained, the court may consider an applicant's conduct outside the statutory period insofar as it has bearing on his or her present moral character. 8 C.F.R. § 316.10(a)(2).  Based on Plaintiff's prior conduct and the circumstances surrounding this case, it can be inferred that Plaintiff had the intent to obstruct justice by submitting forged documents to the court in violation of § 1503.  Plaintiff's actions in this regard constitute "unlawful acts" under 8 C.F.R. § 316.10(b)(3)(iii), and thus bar Plaintiff from establishing good moral character.

### D.  Second-Degree Assault

Defendant further asserts that Plaintiff cannot establish good moral character because he committed second-degree assault. According to charging documents filed in the District Court of Maryland for Montgomery County, on October 17, 2001, Police Officer Keith Duggan responded to a domestic violence complaint at 11395 Old Columbia Pike and observed Plaintiff and Hannah Etoke engaged in a verbal dispute in a parking lot.  Officer Duggan spoke with Plaintiff, who explained that he had come to that location to visit a girlfriend with whom he had a child in common.  Upon returning to his vehicle, Plaintiff encountered Ms. Etoke, another girlfriend

with whom he resided and also had a child in common, and a physical altercation ensued.  Ms. Etoke advised the officer that Plaintiff struck her several times on her head and bit her hand.  Officer Duggan observed wounds on Ms. Etoke's left temple and right index finger, and an eyewitness confirmed that Plaintiff was the primary aggressor.  Plaintiff was subsequently arrested and charged with second-degree assault and disorderly conduct.  (Paper 88, Ex. 22; A.R. 2109-17).

According to Plaintiff, Defendant's claim in this regard ignores that the charges against him were ultimately *nolle prossed* and that Ms. Etoke filed an affidavit in 2003 clarifying that it was she who attacked Plaintiff.  In the affidavit, Ms. Etoke states, "I attacked [Plaintiff] because I was very angry at that time." (Paper 21, Ex. 3).  She further affirms that "during that time [Plaintiff] only tried to stop [her] and to defend himself from [her] attack," and that she was "very surprised" when the police arrived and placed Plaintiff under arrest.  (*Id.*).  Plaintiff argues that Ms. Etoke's affidavit, coupled with the *nolle prosequi* disposition, demonstrate that this incident does not bar a finding of good moral character.  In light of the extenuating circumstances at issue here, the court agrees.  Plaintiff's arrest for assault is not, by itself, a bar to establishing good moral character.

### E.   Reporting Criminal History on N-400 Form and During Naturalization Interview

Defendant next contends that Plaintiff cannot establish good moral character because he failed to report his entire criminal history on his N-400 form, or naturalization petition, and during his naturalization interview.   Plaintiff submitted his N-400 on April 2, 2003.   In response to a question on the form requiring him to list all of the crimes for which he had been "arrested, cited, detained, or charged," Plaintiff listed the following crimes: (1) "family dispute"; (2) "theft"; (3) "carrying a concealed weapon"; (4) "deprevation [sic] of property"; and (5) "larceny." (Paper 88, Ex. 23, at 9; A.R. 177-188).   According to Defendant, Plaintiff omitted other crimes for which he was convicted, including possession of marijuana, impersonation, and issuing a bad check. Defendant observes that Plaintiff swore under penalty of perjury, during his naturalization interview, that the answers he listed on the N-400 were correct, and argues that Plaintiff's omissions violate 8 U.S.C. § 1101(f)(6), which provides that a person who gives false testimony for the purpose of obtaining a benefit under the Immigration and Naturalization Act ("INA") shall not be regarded as a person with good moral character.

Plaintiff concedes that he did not list his entire criminal background on his N-400 application, but claims that a former attorney advised him that he did not have to do so as long as he

31

made a full disclosure during his interview, which Plaintiff contends that he did. Plaintiff provides no evidence in support of this claim, however, such as a supporting affidavit or declaration from his former counsel or from the immigration official who conducted the interview. On those issues in which the nonmoving party has the burden of proof, it is the party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. Plaintiff presents no such evidence here, but even if he did, it is undisputed that he signed the N-400 form under penalty of perjury. As noted previously, a petitioner who takes an oath under penalty of perjury has an "absolute" duty to ensure that his answers are true and correct. *Sadig*, 271 Fed.Appx. at 295. Accordingly, Plaintiff's failure to disclose his entire criminal history on his N-400 form and during his naturalization interview constitutes false testimony for the purpose of obtaining an immigration benefit, in violation of 8 U.S.C. § 1101(f)(6) and 8 C.F.R. § 316.10(b)(2)(vi). *See Medina v. Gonzales*, 404 F.3d 628, 67 (2nd Cir. 2005) ("a naturalization applicant [gives] 'false testimony,' within the meaning of 8 U.S.C. § 1101(f)(6), by making false statements under oath during his 'preliminary examination'"); *see also Keiak v. Dedvukay*, 557 F.Supp.2d 820, 829 (E.D.Mich. 2008) ("by failing to disclose his convictions, the petitioner gave false

testimony to obtain an immigration benefit in violation of 8 U.S.C. § 1101(f)(6) and 8 C.F.R. § 316.10(b)(2)(vi)"); *United States v. Abdulghani*, 671 F.Supp. 754, 756 (N.D.Ga. 1987) (alien's failure to disclose drug offenses and shoplifting arrest on his N-400 form and during interview barred a finding of good moral character under 8 U.S.C. § 1101(f)(6)).

### F. Acts of Criminal Adultery

Defendant further argues that Plaintiff is not a person of good moral character because he committed at least three acts of criminal adultery. Plaintiff was married to Felicia Moore on June 21, 1991, and their divorce became final on December 30, 2002. (Paper 88, Ex. 25; A.R. 285, 1176). While married to Ms. Moore, Plaintiff fathered three children with two other women, Geraldine Edibe Enone and Hannah Ngono Etoke. Defendant argues that these acts of adultery ultimately led to Plaintiff's divorce with Ms. Moore. Plaintiff asserts that although he did not officially obtain a divorce from Ms. Moore until 2002, he and Ms. Moore were separated when he had relations with the other two women. Under 8 C.F.R. § 316.10(b)(3)(iii), having "an extramarital affair that tended to destroy an existing marriage" acts as a bar to establishing good moral character unless the applicant can provide extenuating circumstances. The Adjudicator's Field Manual of the USCIS states that "[i]f the lawful marriage ceased to be viable and intact before the commission of the adultery, such sexual

misconduct without cohabitation does not support a finding of lack of good moral character."  INS Adj. Field Manual ch. 73.6 (2006); *see also Moon Ho Kim v. Immigration & Naturalization Serv.*, 514 F.2d 179, 181 (D.C. Cir. 1975) (holding that the applicable uniform federal standard is that of "extra-marital intercourse which tends to destroy an existing, viable marriage").

Here, Ms. Moore states that she and Plaintiff stopped living together in September 1994.  (Paper 99, Ex. 2).  She further states that, in 2000 and 2002, when Plaintiff had three children with Ms. Enone and Ms. Etoke, her marriage with Plaintiff "had long been over despite the fact that the divorce was not complete." (*Id.*). Ms. Moore avers that "[Plaintiff's] relations with other women in 1999-2001 had nothing to due [sic] with why the two of us divorced." (*Id.*).  Drawing all reasonable inferences in Plaintiff's favor, a reasonable fact finder could determine that Plaintiff's relations with Ms. Enone and Ms. Etoke did not destroy his marriage with Ms. Moore; therefore, Plaintiff's actions in this regard do not constitute "unlawful acts" under 8 C.F.R. § 316.10(b)(3)(iii).

### G.  Failure to Pay Child Support

Federal regulations provide that an applicant for citizenship shall be found to lack good moral character where the applicant has "[w]illfully failed or refused to support dependents." 8 C.F.R. § 316.10(b)(3)(i).  The Frederick County Department of Social

Services, as well as Ms. Enone, with whom Plaintiff has two children in common, jointly filed a complaint against Plaintiff to obtain child support. (Paper 88, Ex. 27; A.R. 1312-13, 1327-28). A hearing was held before a master on May 29, 2007, at which time Plaintiff was required to pay $581 per month in child support to Ms. Enone pursuant to the Maryland Child Support Guidelines. (A.R. 1303). Plaintiff asked the court for a downward deviation to $381 per month in light of his financial obligations to his other children, but that request was denied. (A.R. 1305). Notably, the master commended Plaintiff for paying Ms. Enone $600 a month in child support even before he had been ordered to do so by the court. On December 21, 2007, a consent order was entered in the Circuit Court for Frederick County, Maryland, pursuant to which Plaintiff agreed to pay Ms. Enone $1500 per month in child support. This significant increase was based upon the parties' agreement that the master incorrectly calculated the child support amount under the Maryland Child Support Guidelines, thereby resulting in an arrearage of $14,500 "through no fault of [Plaintiff]." (Paper 88, Ex. 28, Consent Order).

While Defendant cites the fact that Plaintiff was found to be $14,500 in arrears as evidence that Plaintiff lacks good moral character, the consent order makes clear that the arrearage amount was not due to Plaintiff's non-payment of child support. Moreover, Plaintiff's request of a two hundred dollar reduction in his child

35

support obligation has no bearing on Plaintiff's moral character, as Defendant alleges. Defendant further claims that, at the time Plaintiff made this request, he was earning over $100,000 per year in salary and could afford to pay $581 a month in child support. Regardless of Plaintiff's salary, however, there is no evidence that he failed to pay or was delinquent in paying child support. Indeed, the evidence reflects that Plaintiff had been paying child support to Ms. Enone long before the court ordered him to do so. Therefore, Plaintiff did not willfully fail or refuse to support his dependents in violation of 8 C.F.R. § 316.10(b)(3)(i).

### H. Failure to Appear in Maryland State Court for a Traffic Citation

Under Maryland law, a person who receives a traffic citation is required to appear in court to answer for the charges, or to pay a fine for the offense. Md. Code Ann. Transp. § 26-204. Failure to comply may result in arrest or a suspension of driving privileges. § 26-204(c) and (d). Defendant asserts that Plaintiff cannot establish good moral character because he failed to appear in court for a traffic citation, which constitutes an "unlawful act" under 8 C.F.R. § 316.10(b)(3)(iii).

On July 8, 1998, police in Takoma Park, Maryland, issued Plaintiff a $50 traffic citation. (Paper 88, Ex. 30; A.R. 1949). It is undisputed that Plaintiff did not appear in district court pursuant to the citation. (*Id.*). According to Plaintiff, he

36

believed he had paid the ticket, particularly because he was subsequently able to renew his license and was never told that he had an outstanding ticket. (Paper 99, Ex. 1, Plaintiff Aff. at ¶ 11). Plaintiff further states that once his current attorney informed him about the outstanding traffic citation, he immediately paid the $50 fine. (*Id*. ¶ 12). In addition, he states that he never received a notice to appear for trial related to the pending traffic citation. (*Id*. ¶ 11).

Defendant counters that Plaintiff's claim that he never received a trial date is false because the District Court of Maryland traffic system indicates that a trial date was scheduled for October 8, 1998, and Plaintiff failed to appear. (Paper 88, Ex. 30). There is still a material issue of fact as to whether Plaintiff was informed of this trial date, however, and viewing the facts in the light most favorable to Plaintiff, it was reasonable for him to believe that he had paid the ticket, particularly where he was not advised of the outstanding citation when he renewed his driver's license. Furthermore, other courts have rejected the notion that traffic and driving offenses alone are sufficient to establish a lack of good moral character. *See, e.g., Shing Woo v. United States*, 288 F.2d 434, 435 (2nd Cir. 1961) (holding that a petitioner's disregard of parking laws, even as many as twenty-three times, is not so "inimical" to the good order of the nation as to justify denial of naturalization); *Keaik*, 557

F.Supp.2d at 828 ("It is true that none of the petitioner's offenses, including driving with a suspended license, were serious enough to imply bad moral character automatically"). Plaintiff's failure to pay his $50 traffic citation in a timely manner does not constitute a bar to establishing good moral character.

## I.  Alleged Violation of Probation Terms

Between 1982 and 1985, Plaintiff was charged with five crimes and pleaded *nolo contendere* to three of them, including charges for felony theft, passing a bad check, and a failure to appear, and his sentences for these convictions included terms of probation.  On June 12, 1986, a warrant was issued for Plaintiff's arrest for violating his probation.  Defendant contends that Plaintiff never resolved this warrant, which is a crime under Kansas law.  *See* Kan. Stat. Ann. § 22-3716.  According to Defendant, Plaintiff's conduct in this regard constitutes an "unlawful act" under 8 C.F.R. § 316.10(b)(3)(iii), and Plaintiff thus cannot establish good moral character.

Plaintiff contends that the Kansas state court allowed him to finish his probation in New York.  He states that he believed that his probation in Kansas had ended and that it was not until 2001 that he learned he was accused of violating his probation.  (Paper 99, Ex. 1, Plaintiff Aff. at ¶ 15).  Plaintiff claims that when he was involved in immigration proceedings in 1992, the government attorney contacted the State of Kansas and was told that Plaintiff

38

had no outstanding warrants or other criminal issues. (*Id.*) He contends that the immigration judge made clear that he would be granted permanent residency because his past misdeeds had been resolved. (*Id.*). Once Plaintiff discovered that he had violated the terms of his probation, moreover, he paid restitution in the amount of $4,839.90, and his probation was terminated on March 24, 2001. (Paper 88, Ex. 32).

It is clear that Plaintiff violated the terms of his probation, thus triggering a warrant for his arrest. However, considering the facts in the light most favorable to Plaintiff, he has presented evidence of extenuating circumstances. It was reasonable for Plaintiff to believe that he had completed the terms of his probation, particularly where he was awarded legal permanent residency in 1992 after the court investigated his prior criminal record and found no outstanding warrants. Therefore, Plaintiff's violation of probation will not serve as a bar to establishing good moral character.

## IV. Conclusion

Defendant has shown that Plaintiff cannot establish that he is a person of good moral character. At the very least, Plaintiff committed Social Security fraud, submitted forged documents to the court, and failed to report his entire criminal history on his N-400 Form and during his naturalization interview. "The burden is on the alien applicant to show his eligibility for citizenship in

every respect." *See Pangilinan*, 486 U.S. at 886.   Here, Plaintiff cannot meet his burden.   Therefore, Defendant's motion for summary judgment will be granted and Plaintiff's petition for naturalization will be denied.

A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge